*236 OPINION OF THE COURT
Renee R. Roth, J.
Two applications test the limits of an unprecedented summary procedure designed to expedite the issuance of death certificates for the thousands who disappeared without a trace as a result of the attacks of September 11, 2001 on the World Trade Center (WTC). The genesis of this novel procedure follows.
It is observed that, from the outset, the massive loss of life on September 11th presented a seeming impasse between two critical public objectives for the many cases in which the bodies of the missing persons were unlikely to be found.
On the one hand, it was urgent that death certificates be issued expeditiously to allow the victims’ families to obtain funds needed for their daily lives, e.g., by applying to the various public agencies and private groups disbursing funds to the families, collecting life insurance proceeds and commencing applications for probate or for letters of administration (each of which requires presentation of a death certificate). On the other hand, it was critical that determinations concerning such absentees be based upon a process that would safeguard the respective interests of the missing persons, their families and public policy.
Initially, the Medical Examiner of the City of New York, who is responsible for filing a report of death (NY City Health Code [24 RCNY] § 205.03), proposed to issue such reports as a purely administrative matter, relying on the fact of the disaster as the basis for his action. The Commissioner of the Department of Health, who is responsible for issuing death certificates (NY City Health Code [24 RCNY] § 205.06), pointed out, however, that in past cases where there were no bodies such certificates had been issued only where a court had declared the absentee dead or had convicted someone of having killed the absentee. Thus the question was whether, in the absence of a body, a report of death could be filed and a death certificate issued without a court proceeding judicially declaring such person dead in accordance with the governing statutes (see, SCPA 902 et seq.; EPTL 2-1.7).
Clearly neither the various statutory schemes nor prior court decisions had ever anticipated a circumstance where such vast numbers of deaths would have to be accounted for in such a short period of time. In the end, the Giuliani administration contacted Chief Judge Judith S. Kaye and the Office of Court *237 Administration to facilitate the development of some procedure by which all death certificates (whatever the county of domicile of the missing person) would be issued after a vetting process in the Surrogate’s Court of New York County, located only a few blocks from the site of the attacks.
It was understood that the identity of a substantial number of those lost in the collapse of the Twin Towers might never be verified through physical remains and that the existing procedures for an adjudication of death could not accommodate the compelling need for expedition under the extraordinary circumstances of the tragedy. Accordingly, an alternative procedure was developed, namely, a summary action (to be brought by the Medical Examiner as plaintiff with the Commissioner of Health as the defendant) that would achieve two seemingly incompatible objectives — speedy relief and a prudent adjudicatory mechanism. The relief requested would be a declaratory judgment confirming the sufficiency of the Medical Examiner’s basis for concluding that a named missing person had died in the September 11th attacks. Thus, the court would not be called upon to adjudicate whether each absentee was dead, but rather, whether plaintiffs proposed administrative action with respect to such absentee was warranted in light of the record. Accordingly, there would be only two necessary parties to the action, i.e., the heads of the two agencies involved in the filing of official reports of death and the issuance of death certificates based on such reports. The time consuming procedures that otherwise would be triggered in a proceeding to determine the death of an absentee (SCPA 902 [3]; 911, 402 [2]; 307 [3] [a]) were replaced by appropriate procedural safeguards, thus assuring due process, as will be seen from the discussion below. Because the issuance of declaratory judgments is solely within the purview of the Supreme Court (CPLR 3001), the two Surrogates of New York County were designated Acting Supreme Court Justices.
The underlying action was commenced by the Medical Examiner on September 28, 2001. Within a month of the filing of the complaint, separate applications for the declaratory relief described above were submitted for more than 1,700 individual victims. Almost all of such applications, as well as the additional 700 or so that were submitted since then, were granted within a day or two of their submission. In each successful case, the application satisfied the three-pronged evidentiary requirement set by the court to minimize the opportunity for fraud and to ensure that the investigation into the facts and *238 circumstances of each alleged victim’s disappearance was sufficient for filing a report of death. Each such application was supported by documents (1) establishing the identities of, and relationship between, the allegedly missing person and the individual seeking a death certificate (e.g., birth certificates, driver’s licenses, passports, marriage certificates); (2) clearly connecting the missing person to the World Trade Center site on the morning of September 11th (affidavits from employers, the airlines and relatives or Mends concerning the absentee’s whereabouts prior to and, if known, immediately after the attacks on September 11th); and (3) confirming the missing person’s continuing absence and that such absence was attributable to death rather than choice or other cause (e.g., affidavits from relatives or friends describing the steps taken in search of the absentee).
By contrast, there are the relatively few applications (approximately 50) which have proved to be a sham or a mistake. In such cases, investigations by the Medical Examiner, with the assistance of the New York City Police Department and Corporation Counsel, have disclosed that the alleged absentees were alive or had died prior to September 11, 2001, or apparently never existed. Each of these applications has been dismissed by order of this court.
The two pending applications present a third category of cases, namely, those that do not meet the evidentiary tests but appear to have a ring of truth. In the case of Sneha Anne Philip, M.D., the application is supported by affidavits from her husband, Ronald Lieberman, M.D., and her mother, Ansa Philip, as well as a report by a private investigator hired by the family. The documents establish that Dr. Philip lived in Battery Park City, located near the Twin Towers, and that, on the evening of September 10, 2001, she used her credit card to purchase various items from a store located directly across from the World Trade Center. No trace of such items was found in the Battery Park City apartment and it is conceded that she did not sleep there that night. Despite a diligent search, Dr. Philip has not been seen or heard from since such time.
Although Dr. Philip’s residence might ordinarily be enough to tie her to the area of the WTC disaster, the evidence that she had not been home at or near the time of the attacks effectively severs such connection for present purposes. Furthermore, evidence concerning Dr. Philip’s professional problems and social relationships indicates that her continuing absence since the evening of September 10, 2001 may be attributable to causes other than the attacks on the Twin Towers.
*239 Based on the foregoing, it is concluded that the record before the court does not support the issuance of a report of death. This is not to suggest, however, that Dr. Philip’s family has no recourse to judicial relief. Where the relationship between a missing person and the events of September 11th is too tenuous to support the issuance of a death certificate on the basis of this summary procedure, the absence may be resolved through a plenary proceeding (see SCPA 911 [1]; EPTL 2-1.7). Accordingly, the present application is denied without prejudice to the commencement of such a proceeding.
The application for Fernando Jimenez-Molinar is similarly questionable. This application is supported by the affidavit of his mother, Nora Molinar Rodriquez, along with miscellaneous documents.
In her affidavit, Mrs. Molinar, a citizen and resident of Mexico, states that her son, also a citizen of Mexico, crossed the border into this country illegally some five years ago, when he was 16 years old. She reports that, as of September 2001, Mr. Jimenez-Molinar had lived in the New York City area for about three years; that he called her on September 8, 2001, and told her that he had gotten a delivery job at a pizzeria located “very close to” the Twin Towers; that she has not heard from him since then, although he usually called her every week or two; that on the evening of September 11th she received a telephone call from a man who identified himself as her son’s roommate and told her that Mr. Jimenez-Molinar had left for work that morning and had not come home; that on September 20th he called again to say that he had still not heard from her son and would not give his name or address (disclosing only that he was an illegal alien); that such telephone call ended abruptly and was not followed by any further contact.
Mrs. Molinar’s continuing efforts in search of her son have been unsuccessful despite a police check of government data banks and notwithstanding the assistance of investigators from a volunteer agency, who surveyed numerous pizzerias and community organizations in the downtown area.
A case such as this, unfortunately, is not suited for the summary relief sought by this application. There is here no sworn statement from anyone with direct knowledge that Mr. Jimenez-Molinar resided or worked in New York City on September 11th, much less direct knowledge that he lived or worked near the World Trade Center on the morning of that day. Nor is there any documentary evidence from which he *240 might otherwise be traced. Even assuming Mrs. Molinar’s truthfulness, her affidavit, stripped of the secondhand information to which she attests, presents an absentee whose whereabouts on September 11th cannot clearly be fixed and whose silence after September 8th is therefore not explainable solely in terms of the attack on the Twin Towers.
Based on the foregoing, it is concluded that the record on this application does not support the issuance of a report of death. Accordingly, the application is denied, again without prejudice to the commencement of a proceeding for relief under the Surrogate’s Court Procedure Act.